**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| QURAN HERRINGTON,<br>on behalf of himself and all others<br>similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>SOLID WASTE SERVICES, INC. d/b/a<br>JP MASCARO & SONS,<br><br>                Defendant. | Civil Action No. 2:24-cv-04902-JMY |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S ASSENTED-TO MOTION FOR**
**FINAL APPROVAL OF CLASS AND COLLECTIVE SETTLEMENT**

## TABLE OF CONTENTS

Pursuant to Fed. R. Civ. P. 23 and 29 U.S.C. § 216(b), Plaintiff Quran Herrington, on behalf of himself and all others similarly situated, respectfully requests final approval of a proposed class and collective settlement.[1]

## BACKGROUND

Defendant employed Plaintiff as a garbage truck driver at its division in Bridgeport, Pennsylvania between October 28, 2021, and August 5, 2022, and then again from September 20, 2022, and July 31, 2024. *See Affidavit of Brook S. Lane*, ¶ 3.[2] Plaintiff was responsible for collecting and transporting waste and recycling and often worked more than 40 hours a week during his employment with Defendant. *See id*. Defendant used the methodology in 29 C.F.R. § 778.112 and 34 Pa. Code § 231.43 to calculate Plaintiff's overtime wages and paid him one-half his regular hourly rate for all the hours he worked in excess of 40 during any given week. *See id*.

Plaintiff filed this case on September 16, 2024. *See* Doc. 1. He alleges that Defendant used the same methodology to calculate and pay overtime wages to all drivers at its Bridgeport location that it used to calculate and pay overtime wages to him. *See generally id*. Plaintiff further alleges that Defendant violated Pennsylvania wage laws and the Fair Labor Standards Act ("FLSA") by using that methodology because it caused the drivers to receive less overtime wages than they earned. *See id*. After Plaintiff filed the complaint, he served Defendant with two sets of requests for production of documents, one set of requests for admissions, and one set of interrogatories. *See* Ex. 2, ¶ 3. Defendant served Plaintiff with one set of requests for admission. *See id*.

---

[1] A copy of the Parties' settlement agreement ("Agreement") is attached as Exhibit 1.
[2] Attached as Exhibit 2.

1

After the parties exchanged and responded to the written discovery requests, they agreed to participate in mediation and explore a class and collective settlement of Plaintiff's claims. *See id.* To that end, the parties filed a motion to stay pending mediation on February 20, 2025. *See* Doc. 14. This Court allowed that motion on February 26, 2025. *See* Doc. 15. On July 15, 2025, the parties mediated the case with the Honorable Stephen M. Orlofsky, a retired U.S. District Court Judge for the District of New Jersey and current partner with BlankRome. *See* Ex. 2, ¶ 3. In preparation for the mediation, Defendant produced extensive data and information concerning the Bridgeport drivers, such as, without limitation, the number of drivers during the relevant time period (268), time records, and payroll data. *See id.* The parties did not reach a settlement at mediation but continued the settlement negotiations amongst themselves thereafter and ultimately reached the proposed settlement before this Court. *See id.*

On December 5, 2025, Plaintiff filed an Assented-To Motion for Preliminary Approval of Class and Collective Action Settlement. *See* Doc. 23. This Court allowed that motion on February 3, 2026; authorized the Parties to engage a third-party fund administrator ("TPA") to administer the proposed settlement and send notice of it to the members of the putative class and collective; and scheduled a final fairness hearing for June 10, 2026. *See* Doc. 24.

**TERMS OF PROPOSED SETTLEMENT**

The total amount of the settlement ("Total Settlement Fund") is $187,500. It is a non-reversionary settlement, meaning that no amount will be returned to Defendant if it is approved. Drivers who did not opt out of the settlement will release all claims asserted or that could have been asserted under Pennsylvania wage and hours laws in the operative complaint. Drivers who opted in to the settlement will also release all claims asserted or that could have been asserted under the Fair Labor Standards Act in the operative complaint. If this Court grants final approval

2

of the settlement, Defendant will remit the Total Settlement Fund within 10 business days of the date of this Court's order to the TPA, which will be responsible for distributing the funds as ordered by this Court. The Total Settlement Fund covers all payments to class and collective members, Plaintiff's attorney's fees and expenses, the TPA's fees, and an enhancement award.

## CLAIMS PROCESS

The Parties engaged Xpand Legal Consulting LLC ("Xpand") to serve as the TPA. Xpand specializes in class action notification and claims administration, with telephone support and web-based support, direct mail services, claims processing, and settlement fund distribution. *See* Declaration of Jonathan Paul, ¶ 2 ("Xpand Dec.").[3] Xpand has extensive experience in class action matters, having provided services in class actions ranging in size from 17 to 350,000 Class Members. *Id*.

On February 23, 2026, Defendant provided Xpand with records for the 268 drivers in the putative class and collective, including their names, addresses, hire and termination dates, and social security numbers. *See id*. at ¶ 4. In preparation for mailing the Court-approved notice to the drivers, Xpand ran all 268 addresses through the National Change of Address database (NCOA) and received updated addresses for 22 drivers. *See id*. at ¶ 4. Xpand mailed the notice to the drivers on or about March 3, 2026. *See id*. at ¶ 4. The notice provided drivers with information about the case and settlement and informed them that they needed to submit a claim form by May 1, 2026, to receive a share of the settlement. *See id*. at ¶ 4, Exhibit B. In addition to the physical mailings, Xpand set up a toll-free telephone number for the purpose of allowing class members to call it to make inquiries regarding the Agreement. *See id*. at ¶ 11, 12.

---

[3] Attached as Exhibit 3.

**ARGUMENT**

With Defendant's assent, Plaintiff now asks the Court to simultaneously certify a state law class and an FLSA collective, as well as to approve the terms of the proposed Settlement Agreement. "As a result, the required analysis is multifaceted." *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 756 (E.D. Pa. 2016). "To certify the state law class, the requirements of Rule 23(a) and Rule 23(b) must be satisfied." *Id.* "To certify the FLSA collective, the Court must review those individuals who have opted into the collective action to ensure that they are in fact similarly situated to the Named Plaintiffs." *Id.*

"Once the state law class and FLSA collective are certified, the Court reviews the terms of the [s]ettlement [a]greement for fairness." *Id.* "As to the state law class, the Court considers whether the Settlement's terms are "fair, reasonable, and adequate," pursuant to Federal Rule of Civil Procedure 23(e) and the factors set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975), and *In re Prudential Ins. Co. Am. Sales Practice Litigation Agent Actions*, 148 F.3d 283, 317 (3d Cir.1998)." *Id.* For the FLSA collective, the Court reviews the [s]ettlement's terms to ensure that it resolves a bona fide dispute, is fair and reasonable to the plaintiff-employees, and does not impermissibly frustrate the FLSA's implementation in the workplace." *Id.*

I.    **The Class Action.**

a.    **The proposed class should be certified under Fed. R. Civ. P. 23.**

Class action settlements are favored because they conserve "substantial judicial resources" and enable parties to "gain significantly from avoiding the costs and risks of a lengthy and complex trial." *In re GMC Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). The advantages to the parties and the courts are particularly apparent in the compromise of class actions, which are "often complex, drawn out proceedings demanding a

4

large share of finite judicial resources." *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993); s*ee also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("In the class action context in particular, 'there is an overriding public interest in favor of settlement,' [which] minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources").

The decision to certify the class turns on whether "the prerequisites of Rule 23(a) and one of Rule 23(b)'s three subparts" are satisfied. *Altnor*, 197 F. Supp. 3d at 756 (*citing In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 – 310 (3d Cir.2008), *as amended* (Jan. 16, 2009). "Under Rule 23(a), Plaintiff[] must demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Altnor*, 197 F. Supp. 3d at 756. Plaintiff is seeking to certify the class under Rule 23(b)(3), which requires him to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.  Numerosity: Rule 23(a)(1).

Numerosity is satisfied if a class is "so numerous that joining of all members would be impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001). This requirement is satisfied here. There were

approximately 268 individuals who worked for Defendant as drivers at its Bridgeport location during the relevant time period, and Defendant used the same methodology to calculate overtime wages for all of them. *See* Ex. 2, ¶ 3.

### 2.    Commonality: Rule 23(a)(2).

Commonality is satisfied if there are "questions of law or fact common to the class." Fed R. Civ. P. 23(a)(2). "The commonality requirement asks whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Altnor*, 197 F. Supp. 3d at 756 (citation omitted). In other words, the class's claims "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[C]ases involving wage claims present perhaps 'the most perfect questions for class treatment.'" *Id*. at 756 – 757 (citation omitted).

Here, the class's claims turn on common questions of law and fact that can be adjudicated by the Court in one fell swoop. Defendant used one methodology to calculate the overtime wages that it paid all drivers at its Bridgeport location, so the class's overtime claims are rooted in the same facts. *See* Ex. 2, ¶ 3. Moreover, resolution of the class's overtime claims turns on the same questions of law: did Defendant's method of paying overtime wages to its Bridgeport drivers cause them to receive less overtime wages than the amounts that they were entitled to receive under Pennsylvania wage laws and the FLSA? Because the claims of the class share a common nucleus of fact and law, commonality is satisfied.

### 3. Typicality: Rule 23(a)(3).

Typicality is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir.1994); *see also, e.g.*, *Newberg on Class Actions,* at § 3:34 (inquiry "focuses on the nature of the proposed class representative's claims or defenses and not on the specific facts from which these arose or the particularized relief sought.").

Here, as shown above, Plaintiff's claims are not just typical of the class members' claims – they are identical. Defendant calculated the overtime wages that it paid to Plaintiff using the same methodology that it used to calculate the overtime wages that it paid all the other Bridgeport drivers. *See* Ex. 2, ¶ 3. Accordingly, typicality is satisfied because "Plaintiff['s] claims are virtually identical in all respects to the other class members' claims." *Altnor*, 197 F. Supp. 3d at 757.

### 4. Adequacy of Representation: Rule 23(a)(4).

Adequacy is satisfied if the Court determines that Plaintiff and class counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir.2006). This prong is satisfied. Plaintiff is an adequate class representative. His interest in obtaining proper compensation for the overtime hours that he worked is squarely aligned with the class members' interests in the same, and he has assisted his counsel in furtherance of that effort by responding to discovery in this

case and readily providing information and documents as needed. *See* Ex. 2, ¶ 3. Plaintiff's

counsel is adequate to be appointed class counsel on behalf of the putative class, as he has

extensive experience litigating class and collective actions involving wage claims in federal and

state courts. *See* Ex. 2, ¶ 4. Given that Plaintiff's "interests are not antagonistic to those of other

class members, and because class counsel is qualified to conduct the litigation, the adequacy

requirement is likewise satisfied." *Altnor*, 197 F. Supp. 3d at 757 (citation omitted).

### 5.    Predominance and Superiority: Rule 23(b)(3).

For a class to be certified under Fed. R. Civ. P. 23(b)(3), the Court conducts a two-step

analysis. During the first step, concerning predominance, "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *In re Nat'l Football League*

*Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3d Cir. 2016). Notably, the U.S. Court of

Appeals for the Third Circuit has held that it is "more inclined to find the predominance test met

in the settlement context." *Id.* "Rule 23(b)(3)'s superiority requirement asks the court to balance,

in terms of fairness and efficiency, the merits of a class action against those of alternative

available methods of adjudication." *Id.* (citation omitted). Both the predominance and the

superiority requirements are met here.

Defendant has acknowledged that it used one methodology to calculate the overtime

wages that it paid Plaintiff and its other Bridgeport drivers. *See* Ex. 2, ¶ 3. Plaintiff alleges that

practice violated Pennsylvania wage laws because it resulted in drivers receiving one-half their

regular hourly rate for each hour they worked in excess of 40 during a week instead of one and

one-half times that rate for such hours. *See generally* Doc. 1. These legal and factual issues are

the predominant disputes in this case, and Defendant's alleged liability for the claims of all

putative class members hinges entirely on the resolution of those common issues. Indeed,

8

Defendant's method of calculating overtime wages either violates Pennsylvania law or it does not. Questions of law or fact common to the state law class members clearly predominate over any questions affecting only individual members.

Likewise, adjudication of this matter as a class action is superior to any alternative. To start, the amount of overtime wages allegedly owed to each class member is relatively small, and courts in this district have recognized that resolution of such claims on a class basis is superior to individual actions. *See, e.g., Altnor*, 197 F. Supp. 3d at 758; *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D.Pa.1994) (Due to "the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action."). If the class members' claims are not adjudicated on a class basis, it is likely that many will go unaddressed, as evidenced by the fact that there are no other pending actions involving the claims in this case. *See, e.g., Altnor*, 197 F. Supp. 3d at 758. For claims that are pursued, the cases may lead to inconsistent results for both the plaintiffs and Defendant. "And when [c]onfronted with a request for settlement-only class certification, as is the case here, a district court need not inquire whether the case, if tried, would present intractable management problems...for the proposal is that there be no trial." *Id*. at 758 (citation omitted).

> **b.     The class action settlement is fair.**

"A class action cannot be settled without court approval based on a determination that the proposed settlement is fair, reasonable, and adequate." *In re Nat'l Football League*, 821 F.3d at 436. "The inquiry into the settlement's fairness under Rule 23(e) protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become

9

fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." *Id*. (citation omitted).

"In order to assist in this examination, the Third Circuit has developed a nine factor test." *Tavares v. S-L Distribution Co.*, No. 1:13-CV-1313, 2016 WL 1743268, at *6 (M.D. Pa. May 2, 2016). Known as the *Girsh* Factors, the factors a court must consider when determining the fairness of a settlement include:

> (1) The complexity, expense, and likely duration of the litigation; (2) The reaction of the class to the settlement; (3) The stage of the proceedings and the amount of discovery completed; (4) The risks of establishing liability; (5) The risks of establishing damages; (6) The risks of maintaining the class action through trial; (7) The ability of the defendants to withstand a greater judgment; (8) The range of reasonableness of the settlement fund in light of the best possible recovery; and (9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id*. (*citing Girsh*, 521 F.2d at 158).

### 1.    The complexity, expense, and likely duration of the litigation.

"The first factor captures the probable costs, in both time and money, of continued litigation." *Tavares*, 2016 WL 1743268, at *6. This factor is met. The parties will incur substantial expenses if the litigation continues because the complexity of Plaintiff's claims all but assures that the case will need to be adjudicated at trial. To prevail, Plaintiff must establish that the Bridgeport drivers were non-exempt for purposes of overtime wages. Defendant challenges the merits of Plaintiff's claims. It contends that Bridgeport drivers engaged in interstate commerce, therefore they are exempt from Pennsylvania overtime laws. *See* 43 Pa. Code. § 333.105(b)(7)) (incorporating the Motor Carrier Act exemption, 49 U.S.C. § 31502 and 29 U.S.C. § 213(b)(1)). Specifically, it is Defendant's position that Bridgeport drivers are exempt because they transported materials between states and the materials that they transported within Pennsylvania were part of a continuous movement in interstate commerce.

10

If the settlement is not approved, the parties will need to engage in substantial additional written discovery concerning these facts and take several depositions. *See* Ex. 2, ¶ 3. Following discovery, the parties will litigate Plaintiff's motion to certify a class and collective action. *See* Ex. 2, ¶ 3. Given that there will be substantial disputes of material facts concerning whether the Bridgeport drivers engaged in interstate transportation or the materials they transported were part of interstate commerce, it is likely that the case will have to be tried because the merits of Plaintiff's claims may not be amenable to resolution on summary judgment.

### 2.       The reaction of the class to the settlement.

"The second *Girsh* factor attempts to gauge whether members of the class support the settlement." *Tavares*, 2016 WL 1743268, at *7 (citation omitted). Of the 268 notices that Xpand sent to the drivers, only 13 were returned to Xpand as undeliverable without a forwarding address. *See* Ex. 3, ¶ 4. Xpand was able to obtain updated addresses for eight of those records via skip-tracing and promptly remailed the notice to those drivers. *See id*. Ultimately, only five of the 268 notices sent to the drivers could not be delivered. *See id*. Xpand received 47 claim forms from drivers, zero requests for exclusion, and zero objections. *See id*. at ¶¶ 6 – 9. In other words, the notice was successfully delivered to almost 98% of the 268 drivers, about 18% of them submitted a claim form, and no one has opposed the settlement.

### 3.       The stage of the proceedings and the amount of discovery completed.

"In order for a settlement to be considered fair, the parties must demonstrate an adequate appreciation of the merits of the case before negotiating." *Tavares*, 2016 WL 1743268, at *7 (citation omitted). "To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken." *Id*. (citation omitted). This factor is met because the parties have exchanged substantial

11

discovery, formally and informally. Defendant produced 1,508 pages of documents in response to Plaintiff's two sets of document requests and answered two sets of interrogatories and one set of requests for admissions. *See* Ex. 2, ¶ 3. Moreover, Defendant produced extensive discovery for purposes of mediation, such as a list of all Bridgeport drivers and detailed time and pay data for a random sampling of them. *See id.* With this discovery, Plaintiff's counsel had sufficient information to estimate the drivers' damages.

### 4.    The risks of establishing liability and damages.

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Tavares*, 2016 WL 1743268, at *7 (citation omitted). "However, in doing so, a court need not conduct a 'mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel.'" *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 238 (D.N.J. 2005). These factors are satisfied because Plaintiff will face immense challenges establishing liability and damages if the settlement is not approved. First, Defendant contends that Plaintiff cannot establish liability because the Bridgeport drivers are exempt from the FLSA's overtime laws under the MCA. Notably, Defendant's position is based largely on the findings of a prior investigation conducted by the Wage and Hour Division ("WHD") of the U.S. Department of Labor that concerned the same claims and allegations that are at issue in this case. *See* Ex. 2, ¶ 3. After concluding its investigation, the WHD found that Defendant's garbage truck drivers, including its Bridgeport drivers, were not entitled to receive overtime under the FLSA because the MCA exemption applied to them. *See id.* While the WHD's decision is not binding on this Court, it is concededly compelling support that favors Defendant's defenses to the merits of

12

Plaintiff's claims. [4] If this Court or a jury ultimately find that Bridgeport drivers are overtime-exempt, the class will recover nothing.

Second, it is Defendant's position in this case that Bridgeport drivers have no damages even if they are found to be non-exempt for purposes of overtime. That is because Defendant used the methodology for calculating overtime wages in 29 C.F.R. § 778.112 and 34 Pa. Code § 231.43 and contemporaneously paid them one-half their regular hourly rate for all the hours that they worked in excess of 40 each week. If this Court or a jury ultimately find that Defendant properly used the methodology for calculating overtime wages in 29 C.F.R. § 778.112 and 34 Pa. Code § 231.43 to calculate the overtime wages that Bridgeport drivers earned, the class will still recover nothing even if they were non-exempt.

**5      The risks of maintaining the class action through trial.**

"Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Tavares*, 2016 WL 1743268, at *8 (citation omitted). "Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id*. (citation omitted). "However, in a settlement class, this factor becomes essentially 'toothless' because 'a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial." *Id*. (citation omitted). Thus, this factor is deserving of minimal consideration. *Id.* Regardless, it is satisfied and significant here for two reasons.

---

[4] Although the putative class's claims arise under Pennsylvania wage laws, not the FLSA, the WHD's decision is relevant because Pennsylvania overtime laws have adopted the FLSA's overtime exemption for drivers who engage in interstate commerce. *See* 43 Pa. Code. § 333.105(b)(7)) (incorporating the Motor Carrier Act exemption, 49 U.S.C. § 31502 and 29 U.S.C. § 213(b)(1)).

To start, Defendant has already defeated a prior class and collective action filed in this Court by a Bridgeport driver (and other employees) that involved the same claims and allegations that are at issue in this case. *See Anthony McKinney v. Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons, Inc.*, C.A. 2:2014cv-00927.[5] Moreover, Defendant has indicated that it intends to challenge Plaintiff's ability to be appointed as the class representative because of his criminal history, his performance during his employment with Defendant, and the fact that he was fired twice by the company for disciplinary issues. *See* Ex. 2, ¶ 3. Given those issues, the risks of maintaining a class action through trial weigh in favor of finding that the proposed settlement is fair, reasonable, and adequate, notwithstanding the fact that the importance of this factor is typically minimal for purposes of settlement approval.

### 6.    The ability of the defendants to withstand a greater judgment.

"This *Girsh* factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'" *Tavares*, 2016 WL 1743268, at *8 (citation omitted). "This factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *Id.* (citation omitted). However, "[w]here a defendant does not claim the potential for financial instability as a justification for the size of the settlement, courts have found this factor to be neutral." *Id.* Whereas here, Defendant has not asserted an inability to pay any more than the settlement amount, "this factor weighs neither for nor against approval of the proposed settlement." *Tavares*, 2016 WL 1743268, at *8.

---

[5] The *McKinney* complaint is attached as Exhibit 4.

> 7. **The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.**

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Tavares*, 2016 WL 1743268, at *8. "In order to assess the reasonableness of a proposed settlement seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Id.* (citation omitted). That said, the Third Circuit has acknowledged that this exercise is "exceedingly speculative," and often unnecessary in cases like this when the reasonableness of a settlement can be "fairly judged" more generally. *In re Prudential Ins.*, 148 F.3d at 322.

Here, the statute of limitations is three years for Plaintiff's Pennsylvania wage law claims (43 Pa. Code § 260.1, *et seq.* and § 333.101, *et seq.*). If a class of Bridgeport drivers is certified, and Plaintiff prevails on those claims, the class is entitled to recover liquidated damages in amount equal to 25% of any overtime wages that Plaintiff proves Defendant failed to pay them. *See* 43 Pa. Code § 260.10. Defendant paid Bridgeport drivers a flat rate for 10 hours of work each day that they worked. *See* Ex. 2, ¶ 3. Based on Defendant's pay practices and the data that Defendant produced for mediation, it is most likely that Plaintiff will be able to prove that Defendant failed to pay the class approximately $209,164.43 in overtime wages. *See id.* This figure is derived from Plaintiff's counsel's estimate that Bridgeport drivers earned approximately $1,152,363.97 in overtime wages during the applicable statute of limitations, and that Defendant paid them approximately $943,199.54 of that amount – i.e. $209,164.43 less than they earned. *See id.* If a class is certified, and judgment is entered against Defendant, Bridgeport drivers would recover approximately $261,455.54 in single and liquidated damages, plus a small

15

additional amount in interest. *See id*. When the risks that Plaintiff and the putative class will face if the litigation continues are considered, discussed *supra*, it is clear the proposed settlement amount, $187,500, is eminently reasonable.

### b.      Notice: Rule 23(e).

"A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." *Tavares*, 2016 WL 1743268, at *15. A settlement notice is adequate when it "contain[s] enough information about the settlement and its implications for participants to enable class members to make an informed decision about whether to be heard concerning the settlement." 2 McLaughlin on Class Action § 6:17 (10th ed.) (collecting cases). As detailed below, the proposed notice adequately informed the class of all relevant details concerning the settlement.

The notice described in plain terms the allegations in this case, the terms and the amount of the settlement, the provision for attorneys' fees, and the proposed incentive payment to Plaintiff. *See* Ex. 3, ¶ 4, Exhibit B. It also identified the date, time, and location of the final approval hearing, and gave class members the means and opportunity to opt-out or to file an objection. *See id*. Indeed, class members had 60 days from the date that notice was issued to submit a claim form, to opt-out, and/or to submit an objection to the proposed settlement. *See id*.

Furthermore, the Parties engaged Xpand to administer the notice process and settlement administration. Xpand is a third-party with extensive experience administering class and collective actions. Xpand handled issuing the notice and claim forms to the class members, following up on undeliverable correspondence, collecting claim forms when they were returned to the administrator, and it will be responsible for issuing tax and settlement payments from the

16

settlement fund to the drivers that submitted claims. The notice and claim forms were sent by first-class mail to the last known address of each individual who met the proposed settlement class definition set forth in the preliminary approval order. *See* Ex. 3, ¶ 4. This method of sending the notice and claim forms to the class is well recognized as the best practicable and most widely accepted means of disseminating information about the settlement. 2 McLaughlin on Class Action § 6:17 ("[C]ourts have consistently held that first-class mail addressed to class members' last known address . . . [is] sufficient to satisfy the notice requirements") (collecting cases).

## II.    The FLSA Collective.

### a.    The FLSA collective should be certified.

When an employer has allegedly failed to comply with the FLSA's requirements, an employee can pursue an action against the employer on "behalf of himself" and in a representative capacity for "other employees similarly situated." *Altnor*, 197 F. Supp. 3d at 758. "The Third Circuit has affirmed use of a two-stage approach to determine whether putative members of a proposed FLSA collective are "similarly situated." *Id*. (citation omitted). This Court found that Plaintiff passed the first stage when it conditionally certified the collective. At this second stage, a court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is <u>in fact</u> similarly situated to the named plaintiff." *Id*. at 759 (emphasis in original) (citations omitted). "To determine whether each individual who has opted into the collective action is "in fact similarly situated to the named plaintiff, the Court may consider whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment."

17

*Id.* (citations omitted). That stand is readily met here.

The 46 drivers who opted into the collective action are not just similarly situated to the named plaintiff – they are identically situated. They worked for Defendant at the same location as Plaintiff, held the same job as Plaintiff, they have alleged claims for the same relief (e.g. unpaid overtime) and, most critically, Defendant used the same methodology to calculate and pay overtime wages to them that it used to calculate and pay overtime wages to Plaintiff. *See* Ex. 2, ¶ 3; *see also, e.g., Altnor*, 197 F. Supp. 3d at 759. Accordingly, the 46 drivers who opted into the collective action are similarly situated to Plaintiff, and the FLSA collective should be certified.

      **b.**        **The FLSA collective action settlement is fair.**

A court may approve a collective action settlement "if it determines that the compromise reached is a fair and reasonable resolution of a bona fide dispute over FLSA provisions rather than "a mere waiver of statutory rights brought about by an employer's overreaching." *Cuttic v. Crozer-Chester Med. Ctr.*, 868 F. Supp. 2d 464, 466 (E.D. Pa. 2012) (citations omitted). "A proposed settlement resolves a bona fide dispute if its terms "reflect a reasonable compromise over issues, such as...back wages, that are actually in dispute." *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir.1982)). "In essence, for a bona fide dispute to exist, the dispute must fall within the contours of the FLSA and there must be evidence of the defendant's intent to reject or actual rejection of that claim when it is presented." *Kraus v. PA Fit II, LLC*, No. 15–4180, 155 F.Supp.3d 516, 530, 2016 WL 125270, at *10 (E.D.Pa. Jan. 11, 2016). If a court determines that a settlement agreement concerns a bona fide dispute, it "next conducts a two-part fairness inquiry to ensure that (1) the settlement is fair and reasonable for the

employees, and (2) the settlement furthers the FLSA's implementation in the workplace." *Altnor*, 197 F. Supp. 3d at 764. The FLSA collective action settlement satisfies those standards.

First, the Agreement resolves bona fide disputes over FLSA provisions. Indeed, Defendant has denied all of Plaintiff's allegations since filing its answer. Defendant maintains that Plaintiff and the other drivers in the putative collection were exempt for purposes of overtime, and contends that even if they were non-exempt, they have no damages because it already paid them all the overtime they were entitled to receive. *See* Ex. 2, ¶ 3. Defendant's position is buttressed by the WHD's investigation concerning the same claims and allegations that are at issue in this case, and its conclusion that Defendant's garbage truck drivers, including its Bridgeport drivers, were not entitled to receive overtime under the FLSA because they were exempt. *See id*. Furthermore, a "dispute concerning overtime pay owed to class members is precisely the type of dispute the FLSA is designed to address." *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 739 (1981).

Second, the FLSA collective action settlement is fair and reasonable for the drivers because it satisfies *Girsh* factors, as discussed above in Section I(b)(1) to (7). *See, e.g., Altnor*, 197 F. Supp. 3d at 764. Third, the settlement furthers the FLSA's implementation in the workplace. The Agreement "does not contain a confidentiality clause, thereby avoiding a common basis for rejecting a proposed FLSA collective settlement." *See, e.g., Mabry*, 2015 WL 5025810, at *2–3. Nor does the Agreement "contain impermissibly broad release provisions, which avoids yet another common pitfall." *Altnor*, 197 F. Supp. 3d at 764.

### III.    Distribution of the proposed settlement.

The Agreement proposes that the Total Settlement Fund be allocated as follows: attorneys' fees equal to one-third of the Total Settlement Fund ($62,500); litigation costs up to

$12,000;[6] an enhancement award of $2,500 for Plaintiff; the TPA's fees up to $12,000 for; and $5,000 for a dispute fund. The remaining amount, at least $93,500 ("Net Settlement Fund), will be sent to members of the class and collective who submitted timely claim forms in an initial distribution. On the first business date that is 90 days after the initial distribution, any amount that remains in the dispute fund and/or checks sent to members of the class and collective in the initial distribution that remain uncashed will be sent on a pro rata basis in a second distribution to the class and collective members who submitted timely claim forms and cashed their checks from the initial distribution. Through this two-step distribution, all amounts in the dispute fund and Net Settlement Fund will be distributed to the class and collective members who timely submitted claim forms and cashed their checks.

Payments to class and collective members will be equal to either a pro rata share of the Net Settlement Fund or $25 (a "Minimum Share"), whichever is greater. A Minimum Share is necessary because of a disparity in the number of hours/days actually worked by each class and collective member. In many instances, class and collective members only worked a few overtime hours during their employment with Defendant, thereby resulting in *de minimis* alleged damages. Pro rata shares will be calculated on a proportional basis using the estimated number of overtime hours that each class and collective member worked during the relevant period. The information used to calculate the shares will be obtained from records that Defendant provided Plaintiff's counsel in connection with mediation. In this manner, each class and collective member will receive a settlement payment that is commensurate with the alleged damages that he or she purportedly sustained.

---

[6] *See* Ex. 2, ¶ 7 at Exhibit B.

20

Each claiming driver will receive payment in two parts: 1/3 allocated to allegedly unpaid wages, for which a Form W-2 will issue, and 2/3 allocated to alleged multiple damages, for which a Form 1099 will issue. This proposed allocation is appropriate under the IRS' long-standing treatment of wage and hour settlements. *See, e.g.,* Rev. Rul. 72-268 ("Since payments representing liquidated damages made by an employer to his employees pursuant to 29 U.S.C. 216(b) are not remuneration for employment, it is further held that they are not 'wages' for Federal employment tax purposes, including income tax withholding. However, such amounts are income to the employees and must be included in their Federal income tax returns").

### a.    The enhancement award is reasonable.

"The Third Circuit has stated that incentive awards in the general, class action context exist 'to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation.'" *Altnor*, 197 F. Supp. 3d at 769 (*quoting Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n. 65 (3d Cir.2011)); *see also, e.g., Paraham v. LCT Opco LLC*, No. CV 24-3148, 2025 WL 2935246, at *10 (E.D. Pa. Oct. 15, 2025); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013) ("Service awards are common in collective and class actions, especially in cases where a common fund has been created to benefit all members."); *Tavares*, 2016 WL 1743268, at *9. As detailed below, the requested enhancement award is reasonable.

First, Bridgeport drivers would receive nothing but for Plaintiff's initiative and efforts. He assisted counsel during its pre-complaint investigation of the claims and throughout the lawsuit, such as providing information about Defendant's pay practices, producing documents, and responding to inquiries for additional information. *See* Ex. 2, ¶ 3. Moreover, Plaintiff

responded to requests for admission from Defendant, and is prepared to appear for a deposition and trial if the settlement is not approved and litigation continues. *See id.*

Second, modest enhancement awards like the proposed award are routinely approved, and the proposed amount is on the low end of awards approved by district courts in the Third Circuit. *See, e.g.*, *Hegab*, 2015 WL 1021130, at *16; *see also, e.g.*, *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005) (collecting cases in which courts approved enhancement awards between $1,000 and $50,000).

Third, the proposed award compensates Plaintiff for the risks he faces for exercising his statutory rights and bringing this case. Indeed, "[i]this age of information technology, future employers can quickly become aware of a plaintiff's involvement in employment rights litigation." *Tavares*, 2016 WL 1743268, at *9. "Rightly or wrongly, plaintiffs… often fear they will not find work after the litigation is resolved, due to their involvement." *Id.* "Thus, the requested enhancement award[] serve[s] not only to compensate [Plaintiff] for [his] participation, but also to reward [him] for their bravery in bringing this litigation forward, as it has resulted in beneficial effects for a large class of drivers." *Id.* Moreover, "[t]he reward[] further incentivize[s] other drivers to participate in other meritorious litigation in the future." *Id.*

  **b.**  **The attorneys' fees are reasonable.**

Awarding a percentage of common fund is the preferred approach for fee petitions in class or collective action cases. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. … Jurisdiction over the fund involved in the litigation allows a Court to prevent … inequity by assessing attorney's fees against the entire fund, thus

22

spreading fees proportionately among those benefited by the suit."); *see also, e.g., Altnor*, 197 F. Supp. 3d at 765 ("In the Third Circuit, '[t]he percentage-of-recovery method is generally favored in cases involving a common fund" because it "allow[s] courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" (citation omitted)). And pertinently here, it is "the prevailing methodology used by courts in the Third Circuit in wage and hour cases." *Altnor*, 197 F. Supp. 3d at 765. Courts consider seven factors to determine the reasonableness of the requested fees under the percentage-of-recovery method:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by counsel; and (7) awards in similar cases.

*See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir.2000). "Of course, "[e]ach case is different, and in certain cases, one factor may outweigh the rest." *Id.*

### 1.     The complexity and duration of the litigation.

"The complexity and duration of the litigation is the first factor a district court can and should consider in awarding fees." *Id.* at 197. As discussed above, this case involves complex issues. Indeed, there are significant legal and factual issues in dispute that concern both the merits of Plaintiff's claims and the Bridgeport drivers' potential damages. Plaintiff could prevail on his claim that Bridgeport drivers are non-exempt for purposes of overtime wages and still recover nothing if this Court or a jury finds that Defendant already paid them all the overtime wages they earned.

The duration of the case supports the requested attorneys' fees. That is because "one purpose of the percentage method" of awarding fees – rather than the lodestar method, which arguably encourages lawyers to run up their billable hours – "is to encourage early settlements

by not penalizing efficient counsel...." *Id.* at 198; *see also, e.g., Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 188 (W.D.N.Y. 2005) (granting 40% fee request, in part, because awarding a percentage of a common fund as attorneys' fees "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."). Rather than toiling in protracted litigation, Plaintiff's counsel expended substantial time and resources working to quickly secure a guaranteed recovery for the class and collective and avoid the risks they would face with continued litigation.

        **2.**      **The size of the fund created and the number of persons benefitted.**

"As a general rule, as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases." *In re Cendant Corp., Derivative Action Litig.*, 232 F.Supp.2d 327, 344 (D.N.J.2002). However, when a common fund is relatively small, courts in the Third Circuit have recognized that awarding higher percentages can be appropriate. *See, e.g., Grier v. Chase Manhattan Auto. Fin. Co.*, No. CIV. A. 99-180, 2000 WL 175126, at *8 (E.D. Pa. Feb. 16, 2000) (*citing In re Smithkline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 534 (E.D.Pa.1990)). Here, the size of the fund created is $187,500 and it benefits 268 drivers. The proposed attorneys' fees are one-third of the settlement. That amount is reasonable given the number of drivers who will be compensated from the settlement, and because the percentage falls squarely in the middle of the range of attorneys' fees awarded in similar cases. *See, e.g., Mabry v. Hildebrandt*, No. CV 14-5525, 2015 WL 5025810, at *4 (E.D. Pa. Aug. 24, 2015) ("In [the Third] Circuit, the percentage of the recovery award in FLSA common fund cases ranges from roughly 20 – 45%.") (collecting cases). Accordingly, this factor is satisfied.

        **3.**      **The presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel.**

24

As detailed above in Section I(b)(2), there have been no objections to the settlement terms and/or the fees requested by counsel. Accordingly, this factor is satisfied. *See, e.g., Altnor*, 197 F. Supp. 3d at 765 ("Here, there have been no objections to the settlement or the proposed attorneys' fees award, which favors approval of the requested fees without reduction." (citations omitted)).

### 4.    The skill and efficiency of the attorneys involved.

Plaintiff's lead counsel has extensive experience litigating wage and hour class and collective actions in federal and state courts across the country. *See* Ex. 2, ¶¶ 4 – 5. By leveraging this experience, Plaintiff's counsel helped Plaintiff reach the proposed settlement before the Court notwithstanding the WHD's prior decision in its investigation concerning Defendant's compensation practices and Defendant's success defending a prior class and collective action involving the same claims and allegations in the case. This factor is satisfied.

### 5.    The risk of nonpayment.

It is well settled that "the risk that counsel takes in prosecuting a client's case should… be considered when assessing a fee award." *Gunter*, 223 F.3d at 199; *see also, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate"). Given Defendant's defenses, the WHD investigation, and the outcome in the *McKinney* matter, the risk of nonpayment for Plaintiff's counsel is particularly acute in this case. *See, e.g., Gunter*, 223 F.3d at 199 (finding the risk of non-payment to be present during its analysis of a fee petition because "other classes of plaintiffs in similar cases against the defendants had lost on similar legal theories."); *see also, e.g., In re Lucent*

25

*Technologies, Inc., Securities Litig.*, 327 F.Supp.2d 426, 438 (D.N.J. 2004) ("[T]he intrinsically speculative nature of this contingent fee case enhances the risk of non-payment and bolsters the Court's analysis"). Accordingly, this factor is satisfied.

### 6. The amount of time devoted to the case by counsel.

"The Third Circuit has stated that it is sensible for district courts to cross-check the percentage fee award against the 'lodestar' method." *Altnor*, 197 F. Supp. 3d at 766 (citation omitted). "The lodestar crosscheck is performed by calculating the 'lodestar multiplier,' which is determined by dividing the requested fee award by the lodestar." *Id*. (citation omitted). "To determine the lodestar method's suggested total, the court multiplies 'the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services.'" *Id*. (citation omitted).

According to contemporaneously maintained time records, Plaintiff's counsel has spent more than 163.05 hours litigating this case to date. *See* Ex. 2, ¶ 6. The hourly rate most recently approved by a court for Plaintiff's counsel was $800. *See id*. at ¶ 3; *see also Pierce v. Roadpulse Logistics LLC*, C.A. No. 1:24-cv-08720 (N.D. Ill. Aug., 25, 2025). That rate is consistent with the rates of opposing counsel in the wage and hour class and collective action cases that Plaintiff's counsel has litigated. Indeed, Plaintiff's counsel's firm, Fair Work P.C., is one of the preeminent plaintiff-side employment firms in the United States. Plaintiff's counsel and other Fair Work attorneys have represented the plaintiffs in seminal employment cases decided by the Supreme Court of the United States, *see New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019), the Massachusetts Supreme Judicial Court, *see, e.g., Sullivan v. Sleepy's LLC*, 482 Mass. 227 (2019), and federal and state courts of appeals and trial courts, *see e.g., Hogan v. SPAR Group, Inc.*, 914 F.3d 34 (1st Cir. 2019).

26

Plaintiff's counsel in this case has been practicing law for almost 16 years, he specializes in wage and hour class actions, and he has been appointed class counsel in numerous wage and hour class actions. *See* Ex. 2, at ¶¶ 2, 4 – 5. More than half the law firms that represented the defendants in those class actions (and multiple other individual cases) are listed in the Am Law 200, so their hourly rates are a fair comparator for determining the reasonableness of Plaintiff's counsel's rate. *Cf. id.* at ¶ 4 *with* International Edition, The 2024 Global 200 Ranked by Revenue.[7] In 2024, the average partner rate for law firms ranked in the top 100 of the Am Law 200 was $985 an hour in Boston, Massachusetts and $1,353 in Chicago, Illinois. *See* Brightflag, Michael Dineen, Sarah Scales, Matt Wheatley, *Hourly Rates in Am Law 100 Firms: Increases and Key Drivers*, 8 – 9 (average hourly rate of litigation partners from all Am Law 100 firms was $1,113.75 in 2024). Law firms in the top 25 have been billing more than $900 an hour for junior associates since at least 2023, and rates for partners from Am Law 200 firms have exceeded $1,000 since the mid-2000s. *See* New York Law Journal, Dan Roe, *What $1,000 an Hour Gets You in the Am Law 200 Today*, 1 (Mar 30, 2023).[8] In light of the expertise of Plaintiff's counsel and Fair Work, the level and complexity of cases they handle, and the hourly rates of the law firms that litigate the same cases, Plaintiff's counsel's hourly rate is reasonable.

When Plaintiff's counsel's hourly rate is multiplied by the hours that have been spent litigating this case to date, the amount of attorneys' fees expended in this case at the time of this motion total at least $130,440. *See* Ex. 2, ¶ 6. Thus, the lodestar crosscheck yields a lodestar multiplier of .48 – i.e. the requested fee ($62,500) divided by the lodestar ($130,440). Notably, the lodestar multiplier will decrease further as the case continues. That is because Plaintiff's

---

[7] Attached as Exhibit 5.
[8] Attached as Exhibit 6.

counsel will expend additional time preparing for and participating in the hearing on final approval. Given the lodestar multiplier, or lack thereof, the lodestar crosscheck affirms that the requested attorneys' fees are reasonable. *See, e.g., Altnor*, 197 F. Supp. 3d at 767 ("A lodestar multiplier of less than one," like the lodestar multiplier here, "reveals that the fee request constitutes only a fraction of the work that the attorneys billed" and thus favors approval" (citation omitted).

### 7. Awards in similar cases.

As discussed above, the percentage of the recovery award in FLSA common fund cases ranges from roughly 20 – 45% in the Third Circuit. *See, e.g., Mabry*, 2015 WL 5025810, at *4. Thus, this factor is satisfied, as the requested percentage of the settlement is squarely in the middle of the amounts of attorneys' fees typically awarded by other courts in comparable cases.

## IV. CONCLUSION.

For the reasons set forth here, Plaintiff respectfully requests that this Court allow his Assented-to Motion for Final Approval of Class and Collective Settlement and enter the proposed final approval order attached as Exhibit 7.

Respectfully submitted,

QURAN HERRINGTON, on behalf himself and all others similarly situated,

By his attorneys,

*/s/ Brook S. Lane*

James B. Zouras
STEPHAN ZOURAS, LLP
222 W. Adams St, Suite 2020

28

Chicago, Illinois 60606
Tel: (312) 233-1550
Fax: (3120 233-1560
jzouras@stephanzouras.com

Brook S. Lane, Esq.
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
T: (617) 607-3260
F: (617) 488-2261
brook@fairworklaw.com

Dated: June 3, 2026

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 5th day of June 2026, I electronically filed the above and foregoing document via the Court's CM/ECF system, which will send notification of said filing to all counsel of record.

*/s/ Brook S. Lane*
Brook S. Lane